IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
October 4, 2005 Session

## STATE OF TENNESSEE v. BERNARD MIGUEL WALLACE

**Direct Appeal from the Circuit Court for Hardin County**
**No. 8292    C. Creed McGinley, Judge**

---

**No. W2004-02124-CCA-R3-CD  - Filed January 3, 2006**

---

The defendant, Bernard Miguel Wallace, was convicted by a Hardin County jury of the sale of under .5 grams of a Schedule II controlled substance, cocaine, a Class C felony. He was sentenced as a Range II, multiple offender to nine years in the Department of Correction and fined $2000. On appeal, he argues: (1) the evidence was insufficient to support his conviction; and (2) his sentence is illegal pursuant to Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). Following our review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JERRY L. SMITH and THOMAS T. WOODALL, JJ., joined.

Curtis F. Hopper, Savannah, Tennessee, for the appellant, Bernard Miguel Wallace.

Paul G. Summers, Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; G. Robert Radford, District Attorney General; and John W. Overton, Jr., Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTS

The defendant's conviction stems from a July 10, 2003, controlled drug transaction with a confidential informant who was working undercover with law enforcement officials. Sergeant Tim Kelley of the Twenty-Fourth Judicial Drug Task Force testified that Investigator Terry Dicus of the Hardin County Sheriff's Department contacted him about an informant, William Arnold, who was willing to "do some narcotics buys for" the task force. Kelley met with Dicus and Arnold at his office, where they decided the informant would try to purchase drugs from the defendant. Asked how the defendant was selected, Kelley said he believed the informant and Dicus made that decision. The officer said that prior to the drug transaction, he "searched Mr. Arnold, searched the vehicle,

placed a body wire on him and gave him some money that was marked."[1]  The officers and the informant then proceeded to the defendant's residence where the officers watched from their car as the informant entered.  Kelley said he was able to both monitor and record the informant's conversation with the defendant "[t]hrough the body wire" the informant was wearing. He explained that he recognized the defendant's voice because he had "had several dealings with" the defendant. Kelley initially heard the defendant "get on [the informant] a little bit for coming to the residence" before hearing Arnold ask the defendant: "'Hey, I hate to bother you, but can I get a fifty[?]"  After the buy was completed, Arnold and Kelley returned to Kelley's office where the informant gave Kelley the "cocaine or the crack rock he[] bought."  Kelley then searched the informant and his car once more before the informant was allowed to leave.  Four days later, Kelley procured a search warrant for the defendant's house, where he found some Brillo pads, rolling papers, and $800 to $900.[2]  None of the marked money used in the transaction with the informant was found.  Kelley identified the tape recording of the transaction and his transcription of it, both of which were then introduced into evidence.

On cross-examination, Kelley acknowledged that he neither saw what occurred inside the defendant's residence during the transaction nor did he ever actually see the defendant.  Asked if he heard other voices over the transmission, Kelley said he heard other voices once the informant left the defendant's residence but could not identify the voices.  The officer acknowledged that the informant was currently in jail and denied that the informant was paid for the transaction.  Kelley identified the "rock" he got from the informant as being "[z]ero point zero three (0.03) grams."  He acknowledged that there were a number of places the informant could have hidden a "rock" this size but emphasized that "[a]ny pressure on it would completely break it."  He also acknowledged that one cannot smoke crack cocaine with a Brillo pad alone and that he did not test the Brillo pad for any cocaine residue.

William Arnold, the informant, testified that he was currently confined at the Hardin County Jail for violating his probation.  He was placed on probation for aggravated burglary, and he acknowledged having other prior felony convictions.  Arnold said he had contacted Investigator Dicus and told him "that in order to help out [his] mom and [his] sister, [he] would do whatever it took to help them out."  Asked about his own drug use, Arnold acknowledged using drugs in the past and restarting when he "got back involved with this."  Arnold said he had met the defendant through his sister.  Arnold explained that he met with Sergeant Kelley at his office on July 10, 2003, to set up the drug buy from the defendant.  Prior to leaving for the defendant's, Kelley searched him to make sure he had no drugs on him and then put a body wire on him.  He said he initially attempted to call the defendant's cell phone but could not make contact so he went to the defendant's home where, he explained:

---

[1]The informant was given $50 with which to buy drugs.

[2]Kelley explained that he waited four days to get a search warrant to protect the informant and because he had hoped the defendant would have "re-upped and had a fresh amount" of drugs.

[W]e went on inside, and [the defendant] -- pretty much, he didn't like the idea of me coming by without calling him and contacting him first, and we went back and forth about that a little bit and got that worked out, and I said I needed to get fifty dollars ($50) worth of crack from him, and he said, "All right," and made the deal, and, pretty much, that was it.

Arnold said he gave $50 to the defendant and the defendant gave him crack in return. He said the defendant had the crack in a "baggie inside of his pocket" and "opened the bag up and took out a chunk and gave it to" him. After getting the crack, Arnold drove back to Kelley's office where he gave it to the officer.

On cross-examination, Arnold again acknowledged his extensive criminal history and said he was on probation at the time he contacted the Drug Task Force about doing a drug buy. He also acknowledged testing positive for cocaine use in November 2003 but denied being "stoned" the day he bought crack from the defendant. Arnold denied buying drugs from the defendant before and said Dicus was the one who suggested that he buy from the defendant.

Brian Eaton, a special agent forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that he analyzed the rock substance that Arnold purchased from the defendant and his "results were that it was cocaine, which is a Schedule II, and the weight was zero point three (0.3) grams."

Investigator Terry Dicus of the Hardin County Sheriff's Department testified that the informant contacted him and they discussed "setting up a controlled buy from [the defendant]." He explained that he knew Arnold from "some previous dealings with him." He said Arnold volunteered to buy drugs in order to help his mother and sister. Dicus said Arnold's mother, who was in jail at the time, was given a beneficial work detail as a result of Arnold's help. On cross-examination, Dicus testified that he contacted Sergeant Kelley and they set up the drug buy. He acknowledged that he could not observe the actual drug transaction but said he listened to it over the transmitting device.

## ANALYSIS

### I. Sufficiency of the Evidence

As his first issue, the defendant challenges the sufficiency of the evidence in support of his conviction. He argues the evidence was, at best, sufficient to convict him of casual exchange pursuant to Tennessee Code Annotated section 39-17-418(a) because "there was no prearranged meeting between [the defendant] and the confidential informant for the purpose of anything, much less the purchase or the sale of narcotics." The State asserts that this was a straightforward "active exchange of money for drugs" done for the defendant's "'pecuniary' gain." We agree with the State.

When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789, 61 L. Ed. 2d 560, 573 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal, a convicted defendant has the burden of demonstrating that the evidence is insufficient. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To obtain a conviction for sale of less than .5 grams of a Schedule II controlled substance, cocaine, the State was required to show beyond a reasonable doubt that the defendant knowingly sold less than .5 grams of cocaine. Tenn. Code Ann. § 39-17-417(a)(3), (c)(2)(A) (Supp. 2005). In his brief, the defendant concedes that he "recognized the informant as William Arnold, knew him by his name, and ultimately sold a small quantity (approximately .3 grams) to William Arnold for fifty dollars ($50.00)." He argues, however, that because "there was no prearranged meeting between [himself] and the confidential informant," because he knew the informant, no marked money or narcotics were recovered from his home, and only a small amount of cocaine was passed between himself and the informant, the evidence only supports a casual exchange. We disagree.

Tennessee Code Annotated section 39-17-418 provides that "[i]t is an offense for a person to knowingly possess or casually exchange a controlled substance unless the substance was obtained directly from, or pursuant to, a valid prescription or order of a practitioner while acting in the course of professional practice." Tenn. Code Ann. § 39-17-418(a) (2003). This court has explained that "a casual exchange is simply the transfer of drugs without the characteristics of bargaining, pecuniary motive, and design typical of a sale. Thus, a common example of a casual exchange is the

spontaneous passing of a small amount of drugs at a party." State v. Edward P. Harris, No. 01C01-9810-CR-00392, 2000 WL 19536, at *3 (Tenn. Crim. App. Jan. 13, 2000) (citing State v. Copeland, 983 S.W.2d 703, 708 (Tenn. Crim. App. 1998)).  Furthermore,

> [w]hether a transfer is a casual exchange is to be determined from all the facts and circumstances of the case.  [State v.] Helton, 507 S.W.2d [117,] 120-21 [(Tenn. 1974)].  Facts and circumstances indicating that the transaction is not a casual exchange include a lack of evidence that the defendant gave the drugs to the buyer out of friendship or as a friendly gesture, see State v. Jack Allison, No. 01C01-9402-CC-00061, 1995 WL 60006, at *4 (Tenn. Crim. App., Nashville, Feb. 14, 1995); no evidence reflecting anything other than a pecuniary motive for the transfer of the drugs, see Harris, 2000 WL 19536, at *3; no prior relationship between the defendant and the buyer, see id.; and no reason for the defendant and the buyer to be together, other than for the buyer to purchase drugs, see State v. Eric Larez, No. 03C01-9810-CR-00379, 1999 WL 997514, at *4 (Tenn. Crim. App., Knoxville, Nov. 4, 1999).

State v. Donald L. Haynes, No. E2000-00672-CCA-R3-CD, 2001 WL 416729, at *4 (Tenn. Crim. App. Apr. 24, 2001), perm. to appeal denied (Tenn. Oct 1, 2001).

Viewed in the light most favorable to the State, the evidence showed that the informant went to the defendant's house with the sole intention of purchasing crack cocaine.  He asked for $50 worth of crack cocaine, which the defendant gave him in exchange for the money.  These actions are more than sufficient to support the defendant's conviction for sale of cocaine.  There is nothing to suggest that this was a "spontaneous" exchange between friends.  The transcript of the drug exchange, entered into evidence as an exhibit, further illustrates how this drug transaction constitutes the sale of cocaine and not a mere causal exchange:

Arnold:  Hi Man, I tried to call man but.

[The defendant]:  That's what I'm saying man[.]  I don't want anybody coming to my house now day's dog, I don't like that.  Shit man.

Arnold:  I tried to call but. (Interrupted)

[The defendant]:  That's what I'm saying man[.]  I don't want no mother Fucker coming to my house at all dog you know what I'm saying.  I'm serious about that now[.]  I ant [sic] playing.

Arnold:  I'm sorry about that NANA[.][3]  I didn't know better you know.

---

[3]According to the transcript, the defendant's nickname is "NaNa."

Arnold: Can I holler at you real quick a minute[?]

[The defendant]: What's up man[?]

Arnold: I just want to get a Fifty from you man.

Arnold: My bad man, I haven't messed enough to know you know.

Arnold: I should have called you first but I don't want to get in [y]our business or anything.

[The defendant]: I didn't mean to be to[o] hard on you man but there is a lot of shit going on right now.

Arnold: Aw I know you don't ever want no surprise man. What's the uh [w]hat's the right number[?]

[The defendant]: . . . . man . . . , that will change after tomorrow[.]

Arnold: Well uh.

[The defendant]: It might be that for one more night but that's it though.

Arnold: Well, I'll never do that to you again.

[The defendant]: Appreciate that man.

Arnold: Now now [sic] I'm happy.

[The defendant]: I got a lot of traffic out here man, I just don't want no surprises man. You know what I'm saying.

Arnold: I appreciate that man.

[The defendant]: The mother fuckers came through last night know what I'm saying[?]

Arnold: Oh no shit.

[The defendant]: [Y]eah.

Arnold: Damn I didn't know that.

[The defendant]: [Y]eah.

Arnold: Be careful man.

The trial court charged the jury that it could find the defendant guilty of casual exchange rather than sale of cocaine. The jury chose to convict the defendant of sale of cocaine, and the evidence is more than sufficient to support its decision.

## II. Sentencing

As his second issue, the defendant argues his sentence is illegal pursuant to Blakely v. Washington, 542 U.S. 296, 124 S. Ct. 2531 (2004). In a supplemental brief filed with this court, he acknowledges that under State v. Gomez, 163 S.W.3d 632 (Tenn. 2005), Blakely does not apply to Tennessee sentencing guidelines. He, however, urges this court to reconsider the Gomez ruling. This, we choose not to do. The defendant was sentenced as a multiple offender based on evidence produced at his sentencing hearing that showed he had four prior felony convictions for sale of cocaine. Accordingly, this argument is without merit.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE